**In re CENARGO INTERNATIONAL, PLC, et al., Debtors.**

Nos. 0310196 to 0310213, 0319224 (RDD).

United States Bankruptcy Court, S.D. New York.

June 27, 2003.

■■■■■■■■■■

Cadwalader, Wickersham & Taft LLP, by Gregory M. Petrick and Michael J. Edelman, New York City, pro se.

Lowenstein Sandler PC, by Jeffrey D. Prol, Roseland, NJ, pro se.

Shearman & Sterling, by James L. Garrity and George J. Wade, New York City, for the Joint Administrators.

Bingham McCutchen LLP, by Sabin Willett, Boston, MA, for the Ad Hoc Committee of Noteholders.

The United States Trustee, New York City, by Paul K. Schwartzberg.

## MEMORANDUM DECISION AND ORDER ON APPLICATIONS FOR PROFESSIONAL COMPENSATION AND REIMBURSEMENT OF EXPENSES UNDER SECTIONS 330(a) AND 331 OF THE BANKRUPTCY CODE

ROBERT D. DRAIN, Bankruptcy Judge.

By order dated February 27, 2003 (the "Suspension Order"), under section 305(a) of the Bankruptcy Code I suspended these chapter 11 cases in deference to administration proceedings for the debtors (collectively, "Cenargo" or the "Cenargo debtors") under the Insolvency Act 1985, consolidated into the Insolvency Act 1986, in the High Court of Justice, Chancery Division, Companies Court, sitting in London (the "English Court"). With the parties' consent, however, the Suspension Order conditioned the suspension of these cases on this Court's retention of jurisdiction to consider the fee and expense applications of estate-compensated professionals under sections 330(a) and 331 of the Bankruptcy Code for the period from the start of the chapter 11 cases—January 14, 2003—to the date of suspension.[1] See 11 U.S.C. § 306 ("[T]he bankruptcy court may condition any order under section . . . 305 of this title on compliance by [a] foreign representative with the orders of such bankruptcy court.").

Determination of the fee and expense applications is a core matter under 28 U.S.C. § 157(a)(2)(A) and (B).

Under consideration are the applications of Cadwalader, Wickersham & Taft PLC ("CWT") and American Marine Advisors, Inc. ("AMA"), counsel and financial advisor, respectively, to Cenargo.[2] CWT seeks

1. The chapter 11 cases of Cenargo Navigation (Hong Kong) Limited and Norse Irish Ferries Ltd. were suspended as of February 20, 2003, the date that the English Court entered administration orders for those debtors. The other chapter 11 cases were suspended as of February 14, 2003.

2. At the hearing on fee applications, counsel for the Joint Administrators announced an agreement that the fees and expenses of Lowenstein Sandler, PC and CIBC World Markets Corp., counsel and financial advisor, respectively, to the Official Committee of Unsecured Creditors (the "Official Committee") would be paid in a reduced amount. The Ad Hoc Committee of Noteholders (the "Ad Hoc Committee") and the United States Trustee, each of which, like the Joint Administrators, had objected to those firms' fee applications, supported this settlement. At the hearing I ruled that the proposed settlement was reasonable and clearly met the standard set forth in section 330(a) of the Bankruptcy Code based on those firms' fee applications, and counsel for the Joint Administrators has since informed the Court that Lowenstein Sandler and CIBC have been paid.

Counsel for the Joint Administrators also informed the Court that the United States Trustee's fees under 28 U.S.C. § 1930(a) and the fees of the high yield noteholders' inden-

$757,080 of fees and $121,179.70 of out-of-pocket expenses. AMA seeks $43,225.81 of fees and $52,916.57 of out-of-pocket expenses.

The Joint Administrators in the English proceedings, the Ad Hoc Committee and the United States Trustee have objected to the applications.

The Joint Administrators and the Ad Hoc Committee make the same three objections. First, they argue that the fees should be significantly reduced or denied based on the professionals' role in Cenargo's original decision not to file English administration proceedings. Second, they argue that there should be no compensation for services performed after January 28, 2003, the date that Lombard Initial Leasing Limited and Lombard Asset Leasing Limited (together, "Lombard"), secured creditors with interests in two of Cenargo's vessels, obtained, *ex parte*, provisional liquidation orders for certain of the debtors in the English Court. The objections contend that when the English Court appointed joint provisional liquidators ("JPLs") on January 28, 2003, it divested Cenargo's board of directors, at which point CWT and AMA should have stopped work. Third, the objections contend that the professionals should not be compensated for litigation against Lombard and the JPLs to enforce the automatic stay (the "Stay Litigation").

Because AMA was less involved than CWT in advising Cenargo to file under chapter 11 and had less of a role in the Stay Litigation, the objections focus primarily on CWT. The Joint Administrators object to AMA's fees and expenses on the separate basis, however, that they have not relied on AMA's work.

The Ad Hoc Committee also asserts that it agreed to only a $300,000 carve-out in the cash collateral order for payment of professional fees.

Finally, the United States Trustee has objected to certain expenses incurred by CWT and AMA and to CWT's request for reimbursement of the fees and expenses of three barristers associated with CWT, because this Court never approved their retention. (The Joint Administrators informed the Court at the fee application hearing, however, that they would not object to the barristers' request for payment in the English administration proceedings.)

Based on an evidentiary hearing, review of CWT and AMA's time and expense records, and consideration of the record of these chapter 11 cases,[3] the applications are granted in part and denied in part.

CWT's fees and expenses are allowed as an administrative expense under sections 330(a) and 503(a) of the Bankruptcy Code in the amounts of $606,080 and $58,817.45, respectively. CWT's allowed expenses reflect a deduction for the $62,362.25 attributable to the English barristers' bills. The Court trusts, however, that the barristers can seek the allowance of compensation and reimbursement of expenses from the English Court.

AMA's fees and expenses are allowed as an administrative expense in the amounts of $43,225.81 and $26,458, respectively.

*Facts*

The following factual recital is lengthy because the objections concern the quality

---

ture trustee under the previously-approved cash collateral stipulation and order have been paid in full.

**3.** Except as noted, the facts are taken from the transcript of the May 21, 2003 hearing on

the fee applications as well as related pleadings, including the time records and other exhibits attached to the applications or submitted with the objections.

of the professionals' advice in a relatively novel cross-border context, not individual time or expense entries or the rates charged by CWT and AMA. Detailed factual findings also may assist the English Court to determine whether to grant comity to this Court's ruling, since the debtors' assets are now clearly under the control of the English Court.

Cenargo is an international transportation group specializing in European freight and passenger ferry services and shipping and logistical services. Its main office is in England, the parent company and most of its subsidiaries are organized under English law, and they conduct their business primarily in England, Ireland and elsewhere in Europe and adjacent waters. None of the Cenargo debtors conduct business in the United States. No Cenargo vessels sail to the United States.

Facing financial difficulties, in the fall of 2002 Cenargo retained CWT and AMA to advise on the restructuring of its debt. CWT is a large law firm with offices in New York and London; it has a sophisticated corporate insolvency practice with expertise in cross-border cases. AMA, which is based in the United States, also has relevant experience, having previously advised financially distressed international shipping companies.

In addition to unsecured trade claims and tax and other priority obligations, Cenargo has three main secured facilities, which were described in the January 14, 2003 declaration of Cenargo's controlling shareholder and CEO, Michael Hendry: (1) a sale-leaseback facility with Lombard, which leases two vessels to Cenargo subsidiaries (which, in turn, have time-chartered the vessels to a third party for service in the English Channel), that is supported by a lien on, among other things, the vessel hire, as well as a £2.3 million cash collateral account, a £2.7 million cash collateral account and a partial guaranty by a third party, Nedship Bank NV; (2) a facility agented by the Bank of Nova Scotia used to purchase certain vessels that secure the debt, approximately £17.8 million and EUR26.7 million of which is outstanding; and (3) high yield notes, approximately $175 million of which remain outstanding, issued primarily, if not exclusively, to, and held by, U.S. noteholders under an indenture governed by U.S. law. The indenture trustee for the high yield notes, Deutsche Bank, holds liens on certain of Cenargo's assets, including preferred mortgages on various vessels and a pledge of the stock of at least one of Cenargo's operating subsidiaries, Norse Irish Ferries Ltd. The Ad Hoc Committee represents the high yield noteholders.

Cenargo and its advisors believed that the Lombard lease facility and related English Channel time charters were highly favorable to Cenargo. This also is the position of the Joint Administrators today, as well as Lombard's position. Thus, it is very likely that Lombard will be made whole as a condition to preserving its lease facility for Cenargo's benefit. Lombard's position is further bolstered by the fact that it is secured with collateral valued substantially in excess of the amount it is owed. It also appeared in January 2003 that the Bank of Nova Scotia facility was oversecured. On the other hand, the high yield notes were, and are, believed to be undersecured and, therefore, were the main focus of the professionals' prepetition restructuring analysis.

In the fall of 2002, CWT and AMA analogized Cenargo's situation to that of other international shipping companies that experienced financial difficulty during the last few years after incurring high yield U.S. debt. Some of these companies, including Global Ocean Carriers, Limited,

Golden Ocean Group Ltd. and Amer Reefer, had successfully restructured their balance sheets in chapter 11 cases, notwithstanding that they, like Cenargo, did not have substantial assets or conduct business in the United States. The primary focus of their chapter 11 cases was the conversion of all or a substantial portion of the high yield U.S. debt to equity, whether on a standalone basis or as a result of a transaction with a third party. Those chapter 11 cases were conducted largely, although not entirely,[4] on a consensual basis. Apparently foreign creditors did not try to seize assets abroad or start liquidations or other insolvency proceedings in other jurisdictions. This lack of disruption, notwithstanding opportunities therefor, may be attributable to such cases' primary focus on restructuring the high yield debt, as opposed to trade debt and other claims of foreign creditors.

Advised by CWT and AMA, Cenargo, hoped to follow the example of such cases. Cenargo's basic restructuring plan was to leave the Lombard lease facility in place, unimpaired, with defaults cured; to leave the Bank of Nova Scotia similarly unimpaired; to satisfy priority claims; to pay unsecured trade debt in full or nearly in full over a relatively brief time, such as six months to a year; and to convert all or a substantial portion of the high yield notes to equity of reorganized Cenargo.

Ironically, given the amount of time and money spent on jurisdictional issues in these cases, Mr. Rollings, one of the Joint Administrators, testified that the Joint Administrators do not expect to depart materially from this restructuring approach, with the exception, perhaps, of less favorable treatment for the unsecured trade debt, which is owed primarily to English creditors.

Assisted by CWT and AMA, Cenargo engaged in restructuring discussions with the secured creditors in late 2002 and early January 2003. Cenargo and the high yield noteholders, who had organized the Ad Hoc Committee and hired a U.S.-based law firm with a London office, did not agree, however, on restructuring terms. Nor did Cenargo succeed in obtaining a standstill from Lombard to permit the negotiations to continue, the Lombard facility being in default, and in January 2003 Lombard threatened to exercise remedies.

Mr. Petrick of CWT testified that until shortly before Cenargo filed under chapter 11, no jurisdiction or jurisdictions for implementation of a restructuring had been selected, although CWT considered filing either in the United States or in England. Among other factors that CWT believed supported a chapter 11 filing was the familiarity of the high yield noteholders and their counsel with chapter 11; indeed, Mr. Petrick testified that some noteholders had participated in the successful shipping company chapter 11 cases discussed above.

Cenargo had some assets in the United States that could provide a basis under section 109(a) of the Bankruptcy Code for filing at least the parent company under chapter 11: the operating company stock previously pledged to Deutsche Bank. In the autumn of 2002, the Cenargo debtors also opened joint bank accounts in the United States, providing further support for a filing under the Bankruptcy Code, if Cenargo chose to file under chapter 11, as well as facilitating payment of the U.S. professionals.

Further justifying a chapter 11 case, Mr. Petrick testified that Cenargo and CWT believed that both Lombard and the Bank of Nova Scotia, like Deutsche Bank, had sufficient assets or conducted suffi-

**4.** *See In re Global Ocean Carriers Ltd.,* 251 B.R. 31 (Bankr.D.Del.2000).

cient business in the United States to be bound, in practical terms, by the automatic stay under the Bankruptcy Code, even if foreign courts, notwithstanding principles of international comity, chose not to enforce the automatic stay against those creditors. The Joint Administrators dispute, however, whether Lombard has any assets in the United States or conducts any business here, and Lombard submitted an affidavit in the Stay Litigation asserting that it does not have any assets or business in the U.S.[5] Neither side provided any detail showing whether and to what extent Cenargo and CWT inquired, if they inquired at all, to confirm Lombard's contacts with the United States. The record is not clear, therefore, whether on the chapter 11 petition date Cenargo and CWT reasonably believed that Lombard would obey the automatic stay.

In the second week of January, 2003 Cenargo accelerated its decision-making process, because, as Mr. Petrick testified without dispute, the Ad Hoc Committee's chairman told Cenargo that the high yield noteholders were going to file an involuntary chapter 11 petition against it if Cenargo did not promptly seek chapter 11 relief on its own. The Ad Hoc Committee's counsel confirmed to CWT shortly thereafter that three noteholders were prepared to begin an involuntary chapter 11 case if Cenargo did not promptly file under chapter 11. The noteholders would be in a position file an involuntary chapter 11 petition by January 15, 2003, which was the date that Cenargo's contractual grace period expired.

Mr. Petrick's testimony also is undisputed that the filing of an involuntary chapter 11 case would have harmed Cenargo. It means one thing for a company to choose to enter insolvency proceedings on an organized basis with the stated goal of restructuring funded debt. The message conveyed to trade creditors, suppliers and customers if ostensibly the most knowledgeable and sophisticated creditors file an involuntary petition is much more ominous and would have been particularly harmful to an international shipping company like Cenargo. Cenargo's customers would have viewed Cenargo's stability skeptically and might take their business elsewhere; Cenargo's trade creditors would have been needlessly alarmed, given the assessment by Cenargo and its professionals that such creditors ultimately would be paid in full or substantially in full in Cenargo's eventual restructuring; and Cenargo's assets would have been subject to arrest in many jurisdictions by such foreign creditors, who might not believe themselves to be bound, as a practical matter, by the automatic stay.

To avoid those risks, Cenargo did what the Ad Hoc Committee had demanded—on January 14, 2003 it began these chapter 11 cases.

Cenargo and CWT had also considered filing administration proceedings in England and had spoken with prospective administrators who might permit management to continue to operate the businesses (subject, of course, to the administrators' supervision) for a reasonable time to attempt a restructuring. Cenargo did not begin administration proceedings, however, when it filed these chapter 11 cases, notwithstanding the fact that since May 31, 2002, the states of the European Union (except Denmark) have been governed by the European Union Insolvency Regulation 2000 (the "EU Regulation"), which,

---

**5.** Declaration of Derek John Lewis, Company Secretary of Lombard's corporate parent, dated April 4, 2003.

generally speaking, would require each of those nations to recognize English administration proceedings for Cenargo—including a statutory stay of enforcement actions—because they would be taking place in the EU member state with the "center of main interests."[6] This would have most effectively protected Cenargo's assets from the creditors, who, with the exception of the high yield noteholders, were English or European. Mr. Petrick testified that, based on the professionals' advice, Cenargo made the decision not to file English proceedings in order to avoid their significant expense. Mr. Petrick also testified that counsel for the Ad Hoc Committee had acknowledged that it would be best to try to avoid the cost of proceedings in England, if possible.

Moreover, Mr. Petrick testified, the Lombard lease facility was structured, in part, through a special purpose Cenargo entity that had no other creditors, and CWT believed that an English administrator of that special purpose entity might be constrained to follow a different course than Cenargo's restructuring generally, in deference to that entity's one creditor, Lombard. Mr. Rollings testified, however, that he believed that it was not a foregone conclusion that Lombard would have its way in the special purpose entity's English administration proceeding; indeed, given the importance of the Lombard lease facility to Cenargo's business, Mr. Rollings testified that competent joint administrators could have succeeded in keeping all of the Cenargo debtors on the same track toward

a restructuring. Neither side offered legal support for their conflicting views; the disagreement appears to be largely a matter of professional judgment, not a black and white issue.

It also is possible, given the rushed nature of Cenargo's chapter 11 filing, that Cenargo simply was not ready with a prospective administrator in hand to start administration proceedings by the deadline that the Ad Hoc Committee had effectively established. However, as counsel for the Joint Administrators pointed out, the possibility that Cenargo would need to seek relief from its creditors existed since CWT and AMA had been retained, even if the out-of-court discussions did not last as long as might have been expected; the professionals had time to get prepared.[7]

Counsel for the Joint Administrators suggested that Cenargo's original decision not to begin English administration proceedings also had an improperly selfish motive not raised in Mr. Petrick's direct testimony: the board and management of a debtor in possession remain in place in chapter 11, whereas an English administration divests the board and, potentially, senior management. It does not appear, however, that this distinction played a significant part in Cenargo's decision to file only under chapter 11. CWT established that it is fairly common for senior management to remain in place (under the administrators' supervision) in English administration proceedings, particularly if the debtor has voluntarily requested such pro-

6. *See generally* Jay Lawrence Westbrook, "Multinational Enterprises in General Default: Chapter 15, the ALI Principles, and the EU Insolvency Regulation," 76 Am. Bankr. L.J. 1 (2002) (hereafter, *"Westbrook"*).

7. Two other possible reasons for filing under chapter 11—the ability to obtain debtor-in-possession financing under section 364 of the Bankruptcy Code, and the exemption under

section 1145 of the Bankruptcy Code from U.S. securities laws that would apply to Cenargo's issuance of new stock and notes to the high yield noteholders under a chapter 11 plan—apparently were not considered by CWT when Cenargo chose to file under chapter 11, although similar relief apparently would not be available in English administration proceedings.

ceedings with the recommendation to the court of an administrator that it has previously chosen. Therefore, by *not* starting administration proceedings Cenargo took a greater risk of having its board and management displaced in involuntary English liquidation proceedings than if it had originally filed for administration in England, as was born out by subsequent events.

Counsel for the Joint Administrators and the Ad Hoc Committee also questioned whether all of the chapter 11 cases were properly authorized under applicable corporate, partnership or limited liability company law. However, counsel offered no legal authority to support this proposition, and, in any event, no harm to Cenargo was shown to have resulted from any such lack of authority, let alone was any such harm tied to CWT or AMA. The issue, then, appears to be a red herring.

The record shows, therefore, that the Cenargo debtors not only had a valid statutory basis for filing under chapter 11, property in the U.S., but also that the decision to file under chapter 11 was supported by reasonable professional judgment based on (1) successful analogous chapter 11 cases, (2) the high yield noteholders' threats and wishes, and (3) the risk that the structure of the Lombard leases might enable Lombard to derail Cenargo's reorganization efforts (notwithstanding the likelihood that Lombard would be paid in full) if the sole situs for the Cenargo debtors' cases was in England. The record also establishes that Cenargo did not file under chapter 11 for nefarious reasons. It was acting responsively to the most pressing issues pertaining to its need to restructure the high yield notes.

This leaves open the question, however, whether it was unreasonable for Cenargo not also to seek relief in England, in a way that economically coordinated the English proceedings with these chapter 11 cases.

On January 14, 2003 this Court held hearings on several "first day" motions by Cenargo, two of which are relevant to that issue. First, Cenargo sought permission to pay certain prepetition debts under the "doctrine of necessity." *See, e.g., Dudley v. Mealey,* 147 F.2d 268, 271 (2d Cir.1945), *cert. denied,* 325 U.S. 873, 65 S.Ct. 1415, 89 L.Ed. 1991 (1945); *In re Chateaugay Corp.,* 80 B.R. 279, 287–88 (S.D.N.Y.1987). These debts fell into three categories: (1) obligations to creditors who did not have assets or business within the effective reach of this Court's jurisdiction—that is, to creditors who were not bound in practical terms by the automatic stay under section 362 of the Bankruptcy Code unless a foreign court extended international comity to the automatic stay and, who, therefore, could attempt to exercise remedies against Cenargo if they were not paid; (2) obligations that would have to be paid if the debtors were to continue to receive critical or irreplaceable goods or services; and (3) debts whose payment would materially benefit the estate on a net basis and which, if not paid, would give rise to a lien or a priority claim. The Court granted the motion on the condition that before paying the first category of claims Cenargo pursue, if available and beneficial to the estates, the imposition of a stay in foreign proceedings.

On January 14, 2003, the Court also approved Cenargo's motion to use cash collateral. The order contained a carveout from the high yield noteholders' cash collateral, which could be used by estate-compensated professionals and any subsequently appointed chapter 7 trustee, as well as to pay the fees of the clerk of the Court and the United States Trustee, in the aggregate "not to exceed $300,000." Under the terms of the agreed order, this

cap was, however, to be "determined without regard to fees and expenses which may be allowed on an interim basis or any prepetition retainer paid to the Debtors' counsel in connection with or related to the chapter 11 cases." That is, the Ad Hoc Noteholders, were willing to let the professionals be paid over and above the $300,000 cap for their ongoing work that would be authorized on an interim basis.[8] In effect, then, the $300,000 carve-out was for "burial expenses" if the chapter 11 cases moved into liquidation mode, or if there was a successful objection to the payment of the professionals on an ongoing basis.

Lombard's U.S. counsel appeared at the first-day hearings and did not complain about the "necessity of payment" motion, the motion to use cash collateral (which also pertained to Lombard's cash collateral), or the fact that Cenargo had filed under chapter 11 rather than in England. Indeed, on that day in the courthouse Lombard's U.S. counsel drafted a proposed handwritten modification of the requested cash collateral order, which, after having been agreed by Cenargo, was submitted to my chambers and incorporated into the order as entered. A few days later, a Lombard representative also attended the meeting of creditors under section 341(a) of the Bankruptcy Code in New York City and applied to serve on the Official Committee as a fiduciary for the unsecured creditors in these chapter 11 cases. Perhaps because of its secured status, Lombard was not appointed to the Official Committee. (Each of the creditors, with the exception of one, appointed by the U.S. Trustee to the Official Committee was English.) Lombard's foregoing

conduct indirectly corroborated CWT's initial assessment that Lombard would abide by the automatic stay.

Mr. Petrick testified that for the first two weeks the chapter 11 cases proceeded largely as Cenargo and CWT had hoped. According to Mr. Petrick, Cenargo experienced only the normal disruption to be expected soon after a chapter 11 filing. Although suppliers, trade creditors and customers made many inquiries about Cenargo's plans and financial health, business generally continued as usual; the debtors actually exceeded their financial projections. There were no attempts to arrest vessels or seize assets during that time.

The Joint Administrators contested this picture, however, asserting that, in addition to the hand-holding with suppliers and customers that normally occurs early in an insolvency case, Cenargo was forced to respond to many threats by creditors who claimed that they were not bound by the automatic stay. CWT's time records confirm this. CWT lawyers in England spent an unusual amount of time responding to creditors during the first two weeks of these cases, although Mr. Petrick attributed their extra activity to the shortage of qualified Cenargo personnel to handle such matters.[9]

In addition to the evidence of CWT's time records, the Joint Administrators introduced several letters to Cenargo representatives from non-U.S. creditors asserting that the automatic stay did not apply and, in some cases, threatening to exercise remedies. Mr. Rollings could not testify about any threats made before his appointment as a JPL on January 28, with the

---

8. The high yield noteholders reasonably could have assumed that the cost of such services would greatly exceed $300,000.

9. When asked whether he agreed with this assertion, Mr. Rollings said that he thought Cenargo could possibly have made more use of operating-subsidiary personnel.

exception of the foregoing letters, and it appeared that, at least by the time that the creditors were made aware of the start of the joint provisional liquidations, the threats remained only threats—there was little or no showing that any of the letter writers tried to carry their threats out. On the other hand, it is quite possible that such threats eventually would have escalated into actions, and it is not clear whether Cenargo and CWT were prepared to respond effectively to protect the estates in that event. CWT's time records reveal only a modest amount of work by relatively junior lawyers in England related to preparation for a possible filing for administration, and at the fee hearing CWT did not try to suggest that it had a fallback strategy in place to protect the estates from, for example, the arrest of a vessel by a creditor that did not have meaningful assets in the U.S. and did not believe itself to be bound by the automatic stay.

This highlights the importance of Mr. Rollings' testimony that a foreign creditor actually caused the arrest of one of Cenargo's vessels in France on February 10, 2003 with, apparently, very little advance warning. It so happened that, unbeknown to the French creditor, the English administration proceedings had already started before the arrest, as an outgrowth, as discussed below, of the resolution of Lombard's invocation of provisional liquidation proceedings against Cenargo. Informed of the existence of the English administration proceedings, the arresting creditor recognized that the stay imposed by those proceedings was effective in France under the EU Regulation and promptly released the arrest. It is not entirely clear that the arrest would have been attempted if the provisional liquidations, whose commencement could have led creditors to believe that Cenargo was going to be liquidated, had not been started. It is clear, however, that if such an arrest had been carried out

when only the chapter 11 cases were pending, it is likely that it would have not been promptly released and might well never have been released, either of which occurrences would have seriously harmed Cenargo.

Clearly, moreover, Lombard would not have requested provisional liquidation if Cenargo had filed administration proceedings before January 28, although this begs the question whether Lombard's *ex parte* request for provisional liquidation reasonably should have been anticipated, or whether the risk that Lombard would request provisional liquidation outweighed Cenargo's reasons for not originally filing administration proceedings at least in tandem with or shortly after the start of the chapter 11 cases that the high yield noteholders had demanded be filed.

Mr. Rollings also testified that the Joint Administrators disagreed with Cenargo's decision to pay approximately $225,000 of prepetition debts during the two-week period before the start of the provisional liquidation proceedings, as authorized by the Court's first-day "necessity of payment" order. Mr. Rollings testified, however, that English law recognizes the doctrine of necessity, under the rubric *"force majeure,"* and that the Joint Administrators agreed with Cenargo's payment of, or promise to pay, approximately $1.4 million of prepetition debt between January 14 and January 28, 2002. This included approximately $1.2 million for prepetition taxes, customs and other governmental obligations, approximately $120,000 to complete the installation of radar equipment mandated by law, and the agreement to pay prepetition debt owed to the debtors' dedicated shipyard, Blue Water, which was not likely to survive without such payment.

Mr. Rollings could not itemize the disputed payments, just as he could not quan-

tify the cost that the Joint Administrators believe Cenargo's decision to seek relief under chapter 11, and not in England, has imposed on the estates. With the exception of an approximately £41,000 payment to Northwestern Ship Repairers, it appears that each of the remaining disputed payments was fairly small. Even assuming that these allegedly *"force majeure"* payments should not have been made, or did not result in a net benefit to the estates (and CWT disputes the Joint Administrators' opinion on this point, based on Cenargo's intimate knowledge of its business and CWT's own professional judgment), it is not clear, given the possibility of a scheme of arrangement in which trade creditors would be substantially paid or paid in full over a fairly short period, whether the transferees were, in any event, materially preferred over the other trade creditors.[10] The Court does not believe, therefore, that the somewhat hypothetical net cost to the estates of these disputed payments on its own outweighed Cenargo's grounds for not filing originally in England.

Mr. Rollings confirmed, moreover, that as of the date of the fee hearing, the debtors' businesses had not deteriorated and continued to perform well. Fortunately, therefore, no actual damages appear to have resulted from the decision to file originally only under chapter 11. The focus, then, principally turns to costs incurred in connection with and in response to Lombard's request for provisional liquidation (as well as, to a lesser extent, the cost of responding to other creditors whose threatened remedial efforts in derogation of the automatic stay did not progress nearly as far as Lombard's) and

whether those costs were reasonable. The inquiry, in turn, is not focused on the propriety of Lombard's action, but, rather, on whether CWT (1) should have reasonably anticipated it, (2) whether CWT and AMA reasonably responded to it, and (3) whether and how much the cost of such response exceeded the reasonably foreseeable cost of dealing with Lombard and other foreign creditors if Cenargo had filed for administration in England in the first place.

As noted, on January 28, 2003, Lombard requested the commencement of English provisional liquidation proceedings for certain of the Cenargo debtors (the provisional liquidation petitions did not include six of the chapter 11 debtors, which were not obligated to Lombard or organized under English law). Lombard did so without requesting relief from the automatic stay in this Court or providing any advance notice to any party, including Cenargo. Lombard moved *ex parte* notwithstanding its prior involvement in these chapter 11 cases, which included, in addition to the activity described above, discussions reflected in CWT's time records between Lombard's U.S. counsel and CWT that took place only days before January 28, during which Lombard's counsel apparently did not indicate that Lombard was planning to request provisional liquidation in England.

On the other hand, Cenargo and its professionals apparently never had any direct assurance that Lombard would not take such a step, and there is at least serious doubt whether Lombard had sufficient assets or business in the U.S. that would have concerned Lombard about the consequences of violating the automatic stay.

---

**10.** Mr. Rollings testified that he did not believe that these disputed payments would be recoverable in the administration proceedings as preferences. His rationale for this statement seemed to be based on the practical difficulty of pursuing many transferees for relatively small amounts.

The most effective assurance against Lombard's taking precipitous action, therefore, seems to have been the fact that Lombard faced no serious economic risk of less than full payment in Cenargo's restructuring (as well as the sophistication of Lombard and its counsel, who could be reasonably expected to understand such fact).

Lombard's papers requesting the joint provisional liquidations, which were attached as an exhibit in the Stay Litigation, sent a mixed message. Lombard expressed the desire for an orderly restructuring process—not a liquidation [11] and not relief to exercise remedies.[12] On the other hand, Lombard's unilateral action and certain features of its requested relief clearly showed a disregard for the pending chapter 11 cases. The foreseeable consequence of Lombard's unilateral action and such requested relief, therefore, even if was not Lombard's desired result, was a period of confusion and disruption.

Lombard's application to the English Court acknowledged that Lombard was violating the automatic stay but contended that it was doing so for the benefit of all creditors. As stated in the almost gorgeous phraseology of Lombard's Divisional Director of Corporate Finance, Andreas Georgiou, in his Declaration submitted in support of the provisional liquidation petitions ("Georgiou Declaration"):

> Lombard are aware that their actions in seeking the appointment of provisional liquidators to the UK Lombard Debtors do not sit happily with the statutory stay under the U.S. Bankruptcy Code. They are particularly concerned that their actions should not be misinterpreted by any party as unilateral action to improve their own position at the expense of other creditors. To the contrary, they are not seeking to steel [sic] a march on other creditors and they wish to ensure that their actions are as transparent as possible as far as the U.S. Court is concerned.

*Id.* at ¶ 37. In keeping with this desire for "transparency," Lombard obtained authority for the JPLs (1) to apply to this Court for orders dismissing these chapter 11 cases, (2) to apply to this Court for ancillary relief, should the JPLs consider it appropriate, pursuant to section 304 of the Bankruptcy Code, (3) if the chapter 11 cases continued despite the JPLs' application to dismiss, to negotiate and enter into a protocol, subject to this Court and the English Court's approval, for the coordination of the joint provisional liquidations with the chapter 11 cases "and any other

11. Lombard asserted that it did not necessarily seek Cenargo's liquidation, but, rather, would be amenable to the commencement of administration proceedings (which, because of Cenargo's control over information required to file such petitions, Cenargo was in a far better position to begin than Lombard, leaving Lombard with only the option of seeking provisional liquidation). *See* Declaration filed in the English Court by Andreas Georgiou, Lombard's Director of Corporate Finance, dated January 28, 2003, at ¶¶ 35–36. *See also* Declaration of Gabriel Moss, Q.C. under 28 U.S.C. § 1746, dated March 31, 2003 ("Moss Declaration") at ¶¶ 31–32.

12. The start of provisional liquidation proceedings ensured that Lombard was stayed under English law, if it had not been effectively stayed previously under the Bankruptcy Code, from exercising remedies without at least the potential for opposition by the JPLs. *See* section 130(2) of the Insolvency Act of 1986; Moss Declaration at ¶ 27 (provisional liquidation gives rise to a stay effective in the United Kingdom, although not necessarily effective elsewhere). Because Lombard's English counsel became counsel for the JPLs, however, and in the prepetition period Lombard had also employed the JPLs in their capacities as Ernst & Young partners to work on the Cenargo matter, CWT might be excused for initially viewing this point with some skepticism, even if it soon became quite clear that the JPLs would act impartially.

like proceedings for the restructuring of the Company," and, even, (4) to seek leave of this Court "for … provisional liquidation proceedings to continue notwithstanding the existence of the Chapter 11 proceedings." *See* Order of Mr. Justice Lightman in *In the Matter of Cenargo Leasing Limited and In the Matter of the Insolvency Act 1986,* dated January 28, 2003 at ¶ 2(j)-(m). All of these provisions clearly were commendable efforts to establish an orderly framework for coordinating the U.S. cases and the English proceedings.

However, Lombard also sought and obtained an anti-suit injunction from the English Court against Cenargo's management continuing to act in these chapter 11 cases,

whether by themselves their servants agents or attorneys and whether in their own names the names of any one or more of the Companies or in any other name, from taking or causing to be taken any step in the Chapter 11 proceedings in respect of any of the Companies without the prior consent of this Court and, in particular but without prejudice to the generality of the foregoing, the Directors be restrained from making any application to the U.S. Court for any order based on an allegation that the petitioning creditors herein or the Provisional Liquidators are, have been or may in the future be in contempt of the U.S. Court in respect of any acts or steps by them outside the U.S. in connection with or pursuant to the winding up petition or proceedings or the Order appointing the Provisional Liquidators.

*Id.* Lombard's English counsel, who upon the start of the provisional liquidations also became the JPLs' counsel, pointedly confirmed the foregoing in a letter faxed to CWT on January 29, 2003:

The directors may not take further steps in the Chapter 11 proceedings without leave. Specifically, they may not make any complaint or cause any complaint to be made to the U.S. Court concerning the application for the appointment of Provisional Liquidators by the English High Court. The directors are resident within the United Kingdom and subject to the jurisdiction of the English Court. If they breach the terms of the injunction, they lay themselves open to contempt proceedings before the English Court.

\* \* \*

To ensure clarity upon this issue, we would remind you that an English company lives and breathes by its directors. They and they alone can authorize your firm to make any application in the name of any English company. Any such authorization (or the delegation to any other person of power to give that authorization) amounts to a flagrant breach of the English injunction by any of the directors named in the order. We should also make the point that the English Court was made fully aware yesterday of the prior filing in the U.S. under Chapter 11.

Letter from Messrs. Denton Wilde Sapte to the Cenargo Group Companies c/o CWT, dated January 29, 2003. Having thus neutralized Cenargo's board, management and professionals, the ostensibly transparent process requested by Lombard might reasonably have been viewed in a different, murkier light, perhaps as merely an exercise in endorsing a *fait accomplis,* although it is not clear whether this was entirely intended by Lombard. (When questioned at the fee application hearing, Mr. Rollings admitted that, at least as far as the JPLs were concerned, they had not given much, if any, thought about who would respond to the contemplated motion to dismiss the chapter 11

cases or who would sit on the other side of the table from the JPLs to negotiate a protocol if these chapter 11 cases were not dismissed, given the injunction that had been imposed on Cenargo's board, management and counsel.)

The rationale behind the Joint Administrators' fee objections—including their objection to the fees of the professionals for the Official Committee, which, as noted above, was settled on the eve of the fee hearing in a reduced amount—suggests at least the Joint Administrators' belief that *no one* should have been paid for reviewing and potentially opposing the contemplated "transparency" motions in this Court, which certainly would be inconsistent with Lombard and their shared counsel's professed desire for coordination with the U.S. cases.

It also was not clear on January 28 that Lombard was not "trying to steal a march on the other creditors," notwithstanding Mr. Georgiou's avowal to the contrary. Paragraphs 25, 27, 29(b) and 35 of the Georgiou Declaration express Lombard's concern that its rights in a chapter 11 case might be inferior to its rights under English law,[13] and paragraph 38 of that Declaration states that although "Lombard could have adopted a strategy of simply

making an application in the U.S. to dismiss the Chapter 11 proceedings without first making any application to [the English] Court … they are particularly concerned not to become embroiled in drawn out jurisdictional litigation in the U.S. during which [Cenargo] might reasonably be expected to employ delaying tactics."

Lombard's stated concern about drawn out jurisdictional litigation in the U.S. ignored, moreover, well-developed law in this Circuit[14] according comity to the interests of foreign creditors in Lombard's position where a "center of gravity" or a choice of law analysis pertaining to a chapter 11 case or a particular issue points outside of the U.S. *See, e.g., Maxwell Commun. Corp. v. Societe Generale (In re Maxwell Commun. Corp.)*, 93 F.3d 1036, 1051–53 (2d Cir.1996). Indeed, upon a proper motion on extremely short notice this Court eventually did suspend these cases under section 305(a)(2) of the Bankruptcy Code in favor of English proceedings, following decisions, as discussed below, previously issued by the current Chief Judge of this Court and two former Chief Judges of this Court, which again calls into question why Lombard believed it had to act precipitously and unilaterally.[15]

---

13. Mr. Georgiou noted Lombard's fear that it could not as easily terminate its leases in a chapter 11 case as in an English proceeding (although Lombard did not seek Cenargo's liquidation); that its lease facility might be recharacterized in chapter 11, to its detriment, as a secured financing transaction; and that Lombard might be adversely affected if the Cenargo debtors were substantively consolidated under U.S. law. *Id.*

14. Lombard has been represented throughout by experienced U.S. counsel as well as eminent English counsel.

15. As noted above, all agree that Lombard is clearly oversecured and that the time-charters of Lombard's vessels are valuable to Cenargo.

Consequently, it was likely that Lombard would be paid in full absent a dramatic turn for the worse in Cenargo's English Channel business (in which event Lombard would be entitled to prompt stay relief under section 362(d) of the Bankruptcy Code). Moreover, even if Lombard's expressed fears about substantive consolidation and lease recharacterization were legitimate (which is questionable under U.S. law given Lombard's secured position, *see, e.g. In re Gulfco Inv. Corp.*, 593 F.2d 921, 927 (10th Cir.1979) (substantive consolidation cannot be used to destroy otherwise valid security interests); 11 U.S.C. § 506(b) (oversecured creditors entitled to postpetition interest at the contract rate)), Cenargo had not requested such relief from this Court. If and when sought, such a request would have

Lombard and its U.S. counsel also ignored very clear U.S. law that, while "the courts of this country have been highly receptive to the recognition and enforcement of foreign insolvency proceedings," and "[t]he Second Circuit has been particularly reluctant to allow the courts of this country to issue anti-suit injunctions against foreign proceedings, holding that such remedies should be 'used sparingly,' and 'should be granted only with care and great restraint,' ... *this Circuit, like others that have reached the issue, holds that a U.S. court should act 'in order to protect its own jurisdiction.'* " *In re Bd. of Dirs. of Hopewell Int'l Ins.,* 272 B.R. 396, 405, 409–10 (Bankr.S.D.N.Y.2002), quoting *China Trade & Dev. Corp. v. M.V. Choong Yong,* 837 F.2d 33, 36 (2d Cir.1987) (emphasis added). *See also Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 126 F.3d 365, 372 (2d Cir.1997), *cert. denied,* 523 U.S. 1106, 118 S.Ct. 1676, 140 L.Ed.2d 814 (1998); *Stonington Partners v. Lernout & Hauspie Speech Prod., N.V.,* 310 F.3d 118, 127 (3d Cir.2002); *Laker Airways Ltd. v. Sabena,* 731 F.2d 909, 917–21, 927 (D.C.Cir. 1984) (each noting an exception to the principle of restraint if a foreign proceeding attempts to carve out exclusive jurisdiction over concurrent actions or dictate the outcome in a pending U.S. case, including preempting how the U.S. court will consider application of principles of comity, by an anti-suit injunction).[16] Lombard's unilateral action thus placed this Court in a difficult and potentially untenable position; before it could address Lombard's rights under international comity or choice

of law principles, the Court to some extent had to undo the action that had purported to force its hand.

Lombard's last stated rationale for requesting the provisional liquidations was that "there are important policy reasons as to why Lombard, and indeed its ultimate parent company, The Royal Bank of Scotland, should take steps to demonstrate that any customer in respect of whom the proper forum for insolvency proceedings is the UK should not file Chapter 11 proceedings simply to avoid or delay its contractual obligations." Georgiou Declaration ¶ 38. But this begged the question, however, why Lombard did not at least first seek to raise this policy issue in the pending chapter 11 cases instead of prejudging the result, and, moreover, was contrary to CWT's analysis of Cenargo's need to file under chapter 11 at least to respond to and deal with the high yield noteholders. CWT might, therefore, be excused for being somewhat skeptical of Lombard's reliance on a policy justification for a unilateral action, which would be costly to the debtors' estates, when Lombard's economic interests did not seem to require such an approach. (It also suggests that the "center of main interests" or "center of gravity" of a large insolvency case may not be so crystal clear as to justify unilateral action, even if a headcount of creditors and assets points clearly to one jurisdiction; the fundamental reason for the need to restructure—in this case, the high yield debt—may at least initially point elsewhere.)

---

taken months for the parties to argue and the Court to determine, at any point during which time the Court would have seriously considered a motion by Lombard for relief from the automatic stay or to suspend these cases under section 305.

**16.** Other Circuits take an even broader view of the need to protect U.S. bankruptcy juris-

diction and enforce the automatic stay. *See, e.g., Hong Kong & Shanghai Banking Corp., Ltd. v. Simon (In re Simon),* 153 F.3d 991, 996–97 (9th Cir.1998), *cert. denied,* 525 U.S. 1141, 119 S.Ct. 1032, 143 L.Ed.2d 41 (1999); *Underwood v. Hilliard (In re Rimsat Ltd.),* 98 F.3d 956, 961 (7th Cir.1996), *reh'g en banc denied,* 1996 U.S.App. LEXIS 30606 (7th Cir. Nov. 21, 1996).

Thus, even if it may have been unreasonable for CWT to have overlooked the risk that Lombard or another foreign creditor would have started English liquidation proceedings, it was reasonable for CWT to believe that it had to respond to Lombard's unilateral action in order to protect the integrity of the statutory stay and this Court's jurisdiction. It also was reasonable for CWT to have a heightened concern that Lombard was not acting simply to protect the interests of the estates and all of Cenargo's creditors consistent with good order.

This is not to say, of course, that Lombard lacked the right under English law to request joint provisional liquidation or that the English Court was required to observe the automatic stay under the Bankruptcy Code. To the contrary, there is no doubt that Lombard had the right to seek provisional liquidation, and there is no doubt that the English Court is not bound by the automatic stay.[17] There is, further, no doubt, as acknowledged by the Suspension Order, that England not only was a proper forum for Cenargo's restructuring proceedings but ultimately became the *best* forum. It should be clear, therefore, but perhaps is worth stating again, that the foregoing discussion focuses only on what CWT should have reasonably inferred upon learning of Lombard's *ex parte* action and whether the facts support the objections by the Joint Administrators and the Ad Hoc Committee that CWT should have immediately and completely deferred to the process that Lombard had sought to invoke.[18]

CWT did not so defer. Instead, upon learning of the entry of the provisional liquidation orders and the anti-suit injunction, CWT informed chambers and asked whether the Court would be available that afternoon to consider a request for an order to show cause to enforce the automatic stay against Lombard and the JPLs. One of the debtors that was not the subject of provisional liquidation proceedings, Cenargo Fast Ferries (No. 2) PLC ("Fast Ferries"), made the motion. It appears that CWT did not receive any instructions

---

**17.** *See Banque Indosuez SA v. Ferromet Resources Inc.* [1993] BCLC 112, 117: "This court is not of course bound by the stay under United States law but will do its utmost to co-operate with the United States Bankruptcy Court and avoid any action which must disturb the orderly administration of Inc. in Texas under ch 11."

**18.** The Joint Administrators and the Ad Hoc Committee argue that, because Cenargo had no business filing under chapter 11 in the first place, CWT should not have responded to Lombard's violation of the automatic stay. *See, e.g., Re Maxwell Communications Corporate plc (No 2), Barclays Bank v. Holman and others* [1992] BCC 757, quoted in the Moss Declaration:

It is the exceptional cases in which justice requires the English court to intervene which cannot be categorized or restricted. But a theme common to recent decisions is that the foreign court is, judged by its own jurisprudence, likely to assert a jurisdiction so wide either as to persons or subject matter that to English notions it appears contrary to accepted principles of international law.

This Court submits, however, that the objectants have ignored a critical fact in framing the issue in this way: the worldwide automatic stay under section 362 of the Bankruptcy Code does not exist in a vacuum but, rather, is inextricably coupled in this Circuit with a jurisprudence that defers to a foreign jurisdiction or foreign law if the request for deference is properly made, as was the case with the Suspension Order. Thus, the Court does not accept that the automatic stay should be considered offensive to foreign jurisdictions; one should at least look at how the stay is enforced before deciding whether imposition of the stay is "contrary to accepted principles of international law." Absent an emergency, the alternative approach suggested by the objectants unduly risks the dismemberment of transnational debtors or, at least, jurisdictional disruption and confusion.

from Fast Ferries' board or management, or from any other Cenargo representative, however, to begin the Stay Litigation. Those individuals would have risked being in contempt of the English Court's anti-suit injunction if they had done so.

Mr. Petrick's January 28, 2003 affidavit in support of the request for an order to show cause stated that there was an imminent risk that Cenargo's management would be divested and the estates harmed upon the start of business the next day in England. (Mr. Petrick reiterated this concern in his testimony at the fee hearing.) I accordingly entered an order to show cause that afternoon (1) scheduling a hearing for the next day, January 29, 2003, on whether an order should not be entered enforcing the automatic stay and assessing damages against Lombard and its agents for any damages to the estates caused by any violation of the stay, and (2) in the interim, enjoining Lombard and the JPLs from acting in furtherance of the provisional liquidations.

Significantly, however, CWT did not pursue the Stay Litigation actively the next day or thereafter. Instead, at the hearing on January 29, CWT and the JPLs' U.S. counsel agreed to a one-day adjournment to enable the parties to try to negotiate the resolution of the conflicting proceedings and injunctions. The creditors supported this approach, tacitly in Lombard's case,[19] expressly in the case of the Ad Hoc Committee, which had filed a limited objection to the Stay Litigation in which it pointed out that, regardless of any stay violation, "serious questions now abound as to the continuing efficacy of the debtor-in-possession model in these cases," although "[n]o doubt because of the urgent problem with which they were presented yesterday, the debtors have not addressed the interests of comity that are raised by this dispute." The Ad Hoc Committee, therefore, contended that it was vital for the parties in interest to try to resolve the jurisdictional issues by agreement. Its limited objection also requested relief from the automatic stay to permit the Ad Hoc Committee to file pleadings or take other actions in the provisional liquidations, particularly because "certain procedural remedies may need to be taken promptly in the English Court to prevent that Court from supervising a liquidation or permitting the dismemberment of the estates by creditors."

The one-day adjournment and all subsequent adjournments of the Stay Litigation were premised upon the parties' agreement to three overriding concerns of the Court: (1) protection of the estates from harm, (2) preservation, for the time being, of the status quo, and (3) mutual respect for the two courts. All parties readily accepted those ground rules. Thus, although before the hearing on January 30 the Official Committee joined in and adopted Fast Ferries' motion to enforce the automatic stay,[20] at the hearing on January 30 all parties again stated their desire to try to work out the jurisdictional issues among themselves and, accordingly, requested an adjournment to February 5, 2002. U.S. counsel for the JPLs having re-confirmed on the record that they would preserve the status quo without the termination of management during that time, I granted the adjournment. Between January 30 and February 5, 2003, management and the JPLs worked reasonably well to-

---

19. Lombard's U.S. counsel attended the hearing and a chambers conference but did not speak.

20. At the fee hearing it was confirmed that no member of the Official Committee had received or been promised any "necessity of payment" consideration.

gether in light of the unusual circumstances.

At the hearing on February 5, 2003, counsel for the Ad Hoc Committee announced that the high yield noteholders, the JPLs and Lombard had found a basis to support joint administration proceedings. Among other things, Lombard agreed to a standstill for as long as the administrators reasonably believed there was a reasonable prospect of a timely restructuring that left Lombard's rights unimpaired (the plan that Mr. Petrick testified had been Cenargo's goal all along). The agreement stated that, unless there was good evidence to support the administrators' view to the contrary, the terms of a timely restructuring would be agreed by June 15, 2003 and the restructuring would be completed by September 31, 2003.[21] Given this agreement and foreign creditors' threats, at the hearing CWT announced that Cenargo had decided to seek administration proceedings in England and received this Court's permission to do so. The Court also ruled that the JPLs had relief from the automatic stay and the June 28 injunction to request administration proceedings if Cenargo had not done so by February 7, and that any party in interest could appear and be heard in such proceedings. The Stay Litigation was further adjourned.

During a chambers conference on February 5, 2003, the parties and the Court also discussed the circumstances under which these chapter 11 cases might be suspended or dismissed after English administration cases were commenced. The Court also stated on the record that it did not believe that any damages for breach of the automatic stay could be found against the JPLs in light of their efforts, along with CWT and other parties in interest, to resolve the issues that had presented themselves on January 28.

Cenargo initiated administration proceedings on February 6, 2003 and did not oppose the English Court's appointment of the JPLs as the Joint Administrators.

After the start of the administration proceedings, the English Court sent this Court a Letter of Request, dated February 7, 2003 ("Letter of Request I"), in which it asked that as a matter of comity this Court not penalize Lombard or the JPLs given that (1) Lombard's request for provisional liquidation was lawful and proper under English law, (2) Lombard had, in any event, agreed with the parties before the U.S. Court to withdraw the winding up petition in favor of administration, and (3) the Joint Provisional Liquidators (although obligated under English law to take control of the debtors' assets) had cooperated with the directors in the interests of the creditors and out of respect for the U.S. Court. Therefore, the English Court stated, "if the U.S. Bankruptcy Court is prepared to give favorable consideration to this request, then the integrity of the English jurisdiction will not have been harmed in an irreparable way and the English court would give favorable consideration to imposing no penalty in the event that such an application to punish [for violation of the English Court's injunction] were made and a contempt were found to have taken place."

Moreover, by order dated February 7, 2003, the English Court also directed that "the costs incurred by Lombard and the former JPLs in opposing proceedings brought against them in the U.S. Court for their alleged contempt of the U.S. Court"

---

**21.** *See* Letter dated February 5, 2003 from Lombard to "Certain holders of the US$175 million 9.75% First Priority Ship Mortgage Notes issued by Cenargo International Plc ... represented by Bingham McCutchen LLP."

would be paid as expenses of administration in the English proceedings. When asked at the fee hearing what benefit Lombard's fees provided to the estates, Mr. Rollings testified that "I think the view of the UK Court was if [the order granting the joint provisional liquidations] was a properly made order, then that was a consequence of those orders, that they would reserve the right for Lombard to come back and seek payment through the court." Mr. Rollings agreed that this was also the Joint Administrators' view.

Consistent with February 5 chambers conference discussion, on February 7, 2003, the Ad Hoc Committee filed a motion to suspend the chapter 11 cases under section 305(a) of the Bankruptcy Code in deference to the English administration proceedings, and the Court scheduled a hearing on that motion for February 14, 2003. At that hearing, it became clear that the conditions under which the Ad Hoc Committee sought the suspension of these chapter 11 cases closely followed the lines of the February 5 chambers conference discussion regarding the treatment of professional fees. As stated by counsel for the Ad Hoc Committee:

> In sum, Your Honor, we think that the most practical course here and the course that demonstrates strength of judgment—that is, as opposed to being the strength of somebody exercising statutory power—would be to suspend these cases, to make clear in the order that the automatic stay is without effect during the term of the suspension. *To have a provision for the payment of the allowed expenses of the estate professionals incurred through today,* to build in some kind of return date for a look back or status conference, which I would suggest should be in the late summer of

this year. That will tend to bracket the period within which we expect to be able to complete the restructuring in the U.K.[22]

The Ad Hoc Committee's counsel also addressed the Stay Litigation:

> We would also suggest that Your Honor reserve to yourself the issue of sanctions. We will take no position on whether you would address that today—and how you would address it, other than to suggest that the pendency of potential sanctions here may be salutary, helping Lombard to continue to perform good citizenship within the U.K., as part of participation in restructuring here.[23]

Ironically, the only objection to the suspension of these cases came from the Official Committee, which represented the interests primarily, if not exclusively, of English and other foreign creditors. They argued, among other things, that all of the creditors' interests were not protected by the agreement between the Ad Hoc Committee and Lombard, and that English administrations would be considerably more costly than the chapter 11 cases. On the former point, however, the record was clear that the Lombard/Ad Hoc Committee agreement did nothing improper or underhanded; indeed, as noted by counsel to the Ad Hoc Committee,

> The fact is that the pendency of this [chapter 11] case did help us negotiate with Lombard, not, as the [official] committee suggested, in an agreement that benefits us alone, but, in an agreement *that will benefit all of the estates,* by forcing a commitment of its valuable ships to the enterprise for a long enough

---

**22.** *See* February 14, 2003 Hearing Transcript at 15–16 (emphasis added).

**23.** *Id.*

period to allow us to come up with a scheme.

*Id.* at 13 (emphasis added). On the latter point, the Ad Hoc Committee agreed that an English administration would be expensive, but pointed out that keeping the chapter 11 cases fully active at this time would only add to that cost, which the high yield noteholders would bear the most. *Id.* at 8–9.

In addition, there was a colloquy with the Court at the suspension hearing among counsel for the Official Committee and CWT, on the one hand, and counsel for the Joint Administrators, on the other, whether suspension of the cases should not await the entry of a formal protocol memorializing the position of the Ad Hoc Committee and the Joint Administrators that they would support the payment in the English Court of the professionals' fees and expenses on a priority basis as awarded by this Court. Given that one of the chapter 11 debtors was not currently subject to any English proceeding and held approximately £3 million in cash at the time, *id.* at 22, CWT and the Official Committee argued that this Court should retain control of that particular debtor, at least, until it was clear that the professionals would be paid the amount that this Court allowed. *Id.* at 33, 56–7. Counsel for the Joint Administrators assured the

Court and CWT, however, that, whether or not there was a protocol, "[W]hat the administrators would do is recommend payment [in the English Court] of the fees you award. It is not a look back and it is not a second bite." *Id.* at 33.[24]

At the close of the hearing on February 14, and based in part on the foregoing representation, the Court granted the motion to suspend these cases under section 305(a)(2) of the Bankruptcy Code without requiring a pre-approved protocol or a hold-back of any funds. I did not put any restriction on the £3 million held by the chapter 11 debtor that was not yet in any English proceeding.

I concluded that considerable case law under analogous facts, including opinions by three present or former Chief Judges of this Court, supported suspension under section 305(a)(2). *See In re Ionica PLC,* 241 B.R. 829 (Bankr.S.D.N.Y.1999); *In re Axona Int'l. Credit & Commerce Ltd.,* 88 B.R. 597 (Bankr.S.D.N.Y.1988), *aff'd* 115 B.R. 442 (S.D.N.Y.1990), *app. dismissed,* 924 F.2d 31 (2d Cir.1991); *In re Gee,* 53 B.R. 891 (Bankr.S.D.N.Y.1985); *see also In re Spanish Cay Co., Ltd.,* 161 B.R. 715 (Bankr.S.D.Fla.1993). The Suspension Order was not based on any misconduct or bad faith of Cenargo in seeking chapter 11 relief but merely upon the factors set forth in section 304(c) of the Bankruptcy Code

---

**24.** Earlier, counsel for the Joint Administrators had stated,

[W]ith regard to the compensation of the professionals in the U.S. who have rendered services, the administrators would have no objection to Your Honor's retaining jurisdiction over the applications for the award of fees by the U.S.-retained professionals, obviously, Your Honor, subject to the rights of the administrators and other interested parties to be heard. The one caveat that the administrators asked us to just alert Your Honor to, is that what we would need to do, and the administrators are prepared to do it, is after Your Honor awards whatever fees Your Honor will award, we believe or the administrators believe that we would have to go and approach the English Court and ask the English Court to allow the administrators to pay those fees as costs of administration. *We are prepared to go and make that application, but what has been suggested is that if this is a course Your Honor would consider following, that, perhaps, Your Honor might consider arming the administrators with perhaps a letter of request to the English Court, which we would be happy to submit. . . . Id.* at 28–29 (emphasis added).

as incorporated in section 305(a)(2)(B). As requested by the Ad Hoc Committee, I also adjourned the hearing on the Stay Litigation to May 21, 2003, when a status conference was scheduled on the continued suspension of these cases, although I reiterated that I did not believe that any damages would lie against the JPLs. I hoped, consistent with the English Court's Letter of Request I, that, under the peculiar facts of these cases, no party would be unduly penalized for violating the conflicting injunctions, although I also expressed concern that no precedent be established that might encourage the future breach of the automatic stay in other cross-border cases, because cross-border recognition of a stay, in the first instance, will often be critically important wherever such cases are commenced. At that time, it appeared that a nearly consensual [25] resolution of the jurisdictional issues had occurred.

The Suspension Order was not entered until February 27, 2003, because I directed the parties at least to try to negotiate a protocol memorializing the discussion regarding professional fees. With no agreement in sight by February 27, though, I entered the Suspension Order, which stated in relevant part, "Consistent with their representations at the hearing on the Motion, the Joint Administrators shall make an application to the English Court to seek direction to cause the Allowed Professional Fees and Expenses to be paid, after an order of this Court approving such fees and expenses becomes a final order, as expenses of the Debtors' administrations." I also requested, "consistent with the views of the parties as stated at the hearing on the motion,[26] that the English Court grant the requests of the Joint Administrators for direction referred to [above] and accord comity to this Court's rulings on

the Allowed Professional Fees and Expenses." Although the English Court obviously would not be bound by the recommendation of the Joint Administrators and the Ad Hoc Committee (out of whose distributions most of the fees would come), it was presumed that their recommendation would be significant.

The Court learned, however, that on April 2, 2003 the Joint Administrators sought direction from the English Court that comity be granted only to this Court's finding on the allowed *amount* of the professional fees covered by the Suspension Order, not their *priority*. Obviously this was contrary to the representations made at the February 14, 2003 hearing and to the Suspension Order, which was not appealed and had become final. Mr. Rollings testified at the fee hearing that this was the result of "a bit of a misunderstanding" between the Joint Administrators and their U.S. counsel. Frankly, given the clarity of the record and the fact that the point was the subject of at least one chambers conference before the February 14 hearing, the Court finds it hard to believe that the Joint Administrators' experienced and careful U.S. counsel misunderstood their clients and that the Joint Administrators did not simply change their minds. The Joint Administrators' April 2 application to the English Court also tried to excuse this about-face on the basis that it might be a dereliction of their duty to the English Court to recommend payment of the allowed professionals' fees, but, then, one would have thought that this would have been apparent to the Joint Administrators before the hearing on February 14, and it does not seem, moreover, to have been a dereliction of duty to have recommended the settlement of the fees and

---

**25.** The lone objection, by the Official Committee, was overruled.

**26.** *See* n. 24, *infra.*

expenses of the professionals for the Official Committee, or the fees and expenses of counsel for the Ad Hoc Committee and Lombard, among others.[27]

Having learned of the Joint Administrators' April 2 request, this Court initiated a conference call with the English Court, which occurred on April 14, 2003 on notice to parties in interest, who participated in the call, in conformity with Article 25 of the Model Law on Cross Border Insolvency of the United Nations Commission on International Trade (UNCITRAL),[28] That call resulted in a second Letter of Request, dated April 17, 2003, from the English Court ("Letter of Request II"), in which the English Court suggested a division of labor between the two Courts that I believe (because this Court always understood that the English Court would not be bound by my ruling on fees and expenses but would consider it under principles of international comity) is consistent with this opinion and order.

The English Court did not hold a substantive hearing on the Joint Administrators' April 2 request for direction regarding professional fees. Instead, the fee hearing in this Court proceeded. Relevant portions of the record of the May 21, 2003 fee hearing have been referred to above. In addition, the following is of note. No party second-guessed the rates or staffing decisions of CWT or AMA, although Mr. Rollings testified that the Joint Administrators have made no use of AMA's work, apparently not even having reviewed it. As a rough point of comparison to the fees and expenses of CWT and AMA, the fees and expenses of the JPLs and their counsel (from January 28, 2003 to February 7, 2003) were, according to Mr. Rollings, approximately $750,000 to $800,000, and the fees of the Joint Administrators from February 7, 2003 through the end of April 2003 were approximately $3.2 million. Finally, it was generally recognized at the fee hearing, including by Mr. Rollings and counsel for the Joint Administrators, that there was no easy precedent for CWT to follow when Lombard triggered the joint provisional liquidations. In the words of U.S. counsel for the Joint Administrators, we were in *"terra incognita."*

Consistent with this Court's Fee and Expense Guidelines, CWT itemized its fees by category. Approximately $240,000 of its fees were incurred in connection with the Stay Litigation in the broadest sense, which includes efforts to resolve the underlying jurisdictional issues and related advice to Cenargo's management. Approximately another $50,000 was incurred in communicating with creditors, including the Official and Ad Hoc Committees, about the Stay Litigation or with other creditors about their threats to pursue remedies despite the automatic stay.

AMA's time records suggest that a substantial portion of AMA's work related to the same tasks (although given its flat fee billing arrangement, AMA's services were provided at a remarkably low imputed rate of under $65 per hour). AMA's disproportionately high expenses were attributable largely to the fact that it used U.S.-based personnel who stayed for lengthy periods in English hotels.

27. It appears to the Court that the Joint Administrators' April 2, 2003 filing may have been at least somewhat influenced by the continuing pendency, at the Ad Hoc Committee's request, of the Stay Litigation. That issue is addressed at the end of this opinion.

28. *UNCITRAL Model Law on Cross–Border Insolvency with Guide to Enactment,* U.N. GAOR, 52nd Sess., Supp. No. 17, U.N. Doc. A/CN.9/433–35, Annex 1 (1997), *available at* http://www.uncitral.org/english/texts/insolven/insolvency.htm.

CWT also incurred approximately $11,000 in drafting a proposed chapter 11 plan beginning on February 6, 2003 and has sought reimbursement of $62,362.25 for the fees and expenses of English barristers in connection with starting the joint administrations. As noted above, Cenargo never sought authorization under sections 327 and 328 of the Bankruptcy Code to retain the barristers.

### Discussion

I. *The Applicable Standard.* The standard governing review of fee applications under the Bankruptcy Code is well established. Section 330 of the Code, entitled "Compensation of Officers," provides in relevant part:

(a) (1) After notice to the parties in interest and the United States trustee and a hearing, . . . the court may award to . . . a professional person employed under section 327 . . .—

(A) reasonable compensation for actual, necessary services rendered by the . . . professional person; . . . and

(B) reimbursement for actual, necessary expenses. . . .

(3) (A) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the

problem, issue, or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4) (A) . . . [T]he court shall not allow compensation for—

(i) unnecessary duplication of services; or

(ii) services that were not—

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

11 U.S.C. § 330(a).

▮▮▮ Consistent with the foregoing, the Court must conduct an objective inquiry, "based upon what services a reasonable lawyer or legal firm would have performed in the same circumstances." *In re Ames Dep't. Stores, Inc.*, 76 F.3d 66, 72 (2d Cir.1996). The focus is on what a reasonable lawyer would have done at the time; the Court should not invoke perfect hindsight. *In re Angelika Films 57th, Inc.*, 227 B.R. 29, 42 (Bankr.S.D.N.Y.1998), *aff'd sub nom. Tenzer Greenblatt LLP v. Silverman*, 246 B.R. 176 (S.D.N.Y.2000). *See also In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13 (Bankr.S.D.N.Y. 1991), which is particularly apt here, given its observation that services relating to matters that ultimately have been consensually resolved (as the Court believed was largely the case with the Stay Litigation and the Suspension Order) rarely should be considered to have been "unnecessary" and therefore usually were "reasonably likely to benefit" the estate:

[T]he appropriate perspective for determining the necessity of the activity should be prospective: hours for an activity or project should be disallowed

only where a Court is convinced it is readily apparent that no reasonable attorney should have undertaken that activity or project or where the time devoted was excessive. *This is especially true where, after the fact, matters have ultimately been resolved by consent.* The Court's benefit of '20/20 hindsight' should not penalize professionals.

*Id.* at 23 (emphasis added).[29] Thus, section 330(a)'s "benefit" and "necessary" criteria do not require a professional to be 100% successful. They are satisfied if a reasonable attorney would have believed at the time that a particular service would benefit the estate, taking into consideration the chances of success and the reasonably-projected attendant costs. *In re Angelika Films,* 227 B.R. at 42. *See also Pfeiffer v. Couch (In re Xebec),* 147 B.R. 518, 524 (9th Cir. BAP 1992); 3 *Collier on Bankruptcy,* ¶ 330.04[1][b] (15th ed.2003) at 330–31.

■ In keeping with Congress' intention that "compensation in bankruptcy matters be commensurate with the fees awarded for comparable services in non-bankruptcy courts," *In re Ames,* 76 F.3d at 71, the Court's inquiry into the "value" of a professional's services often is described as a market-driven approach. That is, if the debtor's professionals, whose retention the Court has previously approved, charge the same amount as the applicable market for comparable services, the Court would need good and articulated reasons to reduce their fee request as excessive. *See Zolfo, Cooper & Co. v. Sunbeam–Oster Co., Inc.,* 50 F.3d 253, 258–60 (3d Cir.1995); *In re Raytech Corp.,* 241 B.R. 785, 789–90

(D.Conn.1999); *In re Drexel Burnham Lambert,* 133 B.R. at 21–22. A corollary is that one may presume, subject to rebuttal, that the staffing and other practical decisions made by attorneys whose retention has been authorized by the Court have been made in good faith in view of the attorneys' legal and ethical responsibilities as officers of the Court. *In re Drexel Burnham Lambert,* 133 B.R. at 23.[30]

■ However, just as competitive pricing considerations usually force non-bankruptcy professionals to review their bills for charges that should be reduced, estate-compensated professionals need to exercise "billing judgment," and, if they have not done so, the Court should do so when reviewing their fee applications. *Zolfo, Cooper & Co. v. Sunbeam–Oster,* 50 F.3d at 259; *In re Raytech,* 241 B.R. at 790; *In re Bennett Funding Group, Inc.,* 213 B.R. 234, 241 (Bankr.W.D.N.Y.1997).

■ In light of the foregoing, it should be clear why "Bankruptcy courts enjoy wide discretion in determining reasonable fee awards," *In re Raytech,* 241 B.R. at 788, citing *In re JLM, Inc.,* 210 B.R. at 24, unless they deviate from the above legal standards or proper procedures. *Id.* An appreciation of the bankruptcy court's experience with fee applications and expert judgment pertaining to applicable billing practices is the starting point of the fee application review process. *Zolfo Cooper & Co. v. Sunbeam–Oster,* 50 F.3d at 258.

■ II. *Were CWT and AMA Required to Stand Down?* If CWT and AMA were required to stop work because the

---

**29.** "20/20 hindsight," moreover, can easily turn into revisionist history, especially where, as here, creditors no longer have an economic interest in keeping a professional paid because they know that, with the underlying deal having been struck, they no longer require the professional's help.

**30.** Nevertheless, the "applicant bears the burden of proving reasonableness of compensation from a bankruptcy estate." *Zeisler & Zeisler v. Prudential Ins. Co. (In re JLM, Inc.),* 210 B.R. 19, 24 (2d Cir. BAP 1997).

Joint Provisional Liquidators divested Cenargo's board, as the Joint Administrators and the Ad Hoc Committee argue, substantial fees and expenses must be disallowed without any further inquiry into CWT and AMA's reasonable billing judgment. For a number of reasons, however, this argument fails.

■ First, it is well established in this Circuit that actions in violation of the automatic stay, like Lombard's *ex parte* initiation of the joint provisional liquidations, are void *ab initio*. *Eastern Refractories Co. v. Forty Eight Insulations, Inc.*, 157 F.3d 169, 172 (2d Cir.1998). Thus, under applicable U.S. law, CWT and AMA's original clients had not changed after January 28, 2003. Of course, under properly invoked principles of comity and sections 362(d) and 305(a)(2) of the Bankruptcy Code, the Court ultimately deferred to English proceedings, but the automatic stay ensures that such decisions are considered in an orderly way, on notice, and with the presumption that parties who have violated the stay will not necessarily obtain the benefits of such violation and might, indeed, be punished for it. The rationale for this process would not need to be stated in a routine chapter 11 case, so deeply ingrained is the principle that the automatic stay is the cornerstone of the Bankruptcy Code. *See, e.g., Midlantic Nat'l Bank v. N.J. Dep't of Environmental Protection*, 474 U.S. 494, 503, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986); *In re Colonial Realty Co.*, 980 F.2d 125, 133 (2d Cir.1992); *In re Flores*, 291 B.R. 44, 49 (Bankr.S.D.N.Y. 2003).

■ The rationale underlying the automatic stay is equally, and perhaps more, important, however, if the debtor has assets and creditors in different countries, when orderly cooperation among different courts is necessary to protect a transnational business as a whole for all the creditors' benefit. The breathing spell provided by the automatic stay and similar stays under the laws of foreign jurisdictions must be preserved, even if it is, as here, relatively brief, if courts and the parties with the true economic stake in the matter are to make rational decisions about potentially competing insolvency proceedings and, if possible, proceed in a way that is respectful of each court's jurisdiction and maximizes distributable value. *See Nakash v. Zur (In re Nakash)*, 190 B.R. 763 (Bankr.S.D.N.Y.1996), in which Chief Judge Lifland applied the automatic stay extraterritorially against an Israeli receiver:

> The purposes of the stay are furthered by this court's determination. The stay exists to protect the estate from "a chaotic and uncontrolled scramble for the Debtor's assets in a variety of uncoordinated proceedings in different courts." [Citations omitted.] This serves to protect and preserve the estate for the benefit of all creditors. The stay also serves to protect and preserve the jurisdiction of the bankruptcy court so that the court can administer the debtor's estate in an orderly fashion.

*Id.* at 768. *See also In re Rimsat*, 98 F.3d at 961; *In re Chiles Power Supply Co., Inc.*, 264 B.R. 533, 541, 542–43 (Bankr. W.D.Mo.2001). The argument asserted by the objectants, on the other hand, would mean that a chapter 11 case could effectively be thrown into chaos by the mere initiation by one creditor of a foreign proceeding in which a trustee, liquidator or other third party was appointed. (The argument also assumes the invalidity of chapter 11's debtor in possession construct, notwithstanding the debtor in possession's fiduciary duties to the estates and

all parties in interest.)[31] Recognition of such a rule would be the negation of international comity.

Perhaps in light of the foregoing, the JPLs did not act as if these cases and the automatic stay did not exist. Instead, while preserving the status quo as much as possible, they tried to resolve the jurisdictional conflict under the ground rules described above. Consistent with the foregoing, the JPLs never fired CWT or AMA. The Joint Administrators dismissed CWT only on February 11, 2003, and the fees incurred after that date are relatively minor and not at issue.

Similarly, the Ad Hoc Committee did not demand that CWT stand down after January 28, 2003. To the contrary, the high yield noteholders emphasized the need to try to resolve the conflicting jurisdictional issues consensually and acknowledged that the high yield noteholders benefitted from the breathing spell afforded by the Stay Litigation, which facilitated their negotiation with Lombard. This approach presupposed the continued existence, during the negotiation, of the debtors in possession and—more importantly, given management's understandable reluctance to act in the face of the English Court's injunction—the continued role of CWT. To a large extent, therefore, CWT was taking a considerable risk for the benefit of the Ad Hoc Committee. The bright line argument that the Ad Hoc Committee now makes clearly is inconsistent with the use that the high yield noteholders made of the Stay Litigation and CWT's services as point-person in that litigation.

In addition, CWT points out that the Cenargo debtor, Fast Ferries, in whose name the Stay Litigation was commenced was not in provisional liquidation proceedings and may not have been covered by the English Court's anti-suit injunction. Thus, even if a bright line test should be applied, the trigger for that test had not occurred on January 28. Technically this may be correct, but, in keeping with the English Court's Letter of Request II, this Court will not undertake to interpret the English Court's anti-suit injunction. (Such jurisdictional accidents, moreover, are not a particularly satisfactory basis for a ruling in light of the larger principles at issue.)

Finally, CWT argues that even if its clients were bound by the English Court's anti-suit injunction, or had been replaced by the JPLs (who, CWT certainly could infer, did not want the Stay Litigation to proceed), CWT had an independent duty to the estates, the creditors and this Court, as officers of the court, to continue to act after January 28. The Joint Administrators and the Ad Hoc Committee dispute whether counsel for a debtor in possession has such a duty, although they do not cite any authority addressing the independent duties, or lack thereof, of counsel for debtors in possession. Instead, the objectants rely only on authorities stating the general proposition that an attorney is merely the agent of his or her client and cannot act except upon the client's instructions or if the client is about to engage in a crime, a fraud or a fraud upon the court. *See, e.g., Masterwear Corp. v. Angel & Frankel, P.C. (In re Masterwear Corp.)*, 233 B.R. 266 (Bankr.S.D.N.Y.1999) (law firm's claim for pre-bankruptcy services to debtor was

---

**31.** *See* UNCITRAL Art. 2's definitions of a proceeding "relating to insolvency" and of a "foreign representative." "The definitions are carefully constructed to include debtor-in-possession reorganization proceedings in Latin American countries, the United States and elsewhere, and a debtor in possession is included in the definition of a 'foreign representative' as a 'body' authorized to administer the proceeding." *Westbrook*, 76 Am. Bankr. L.J. at 12.

disallowed, because debtor's new board had instructed law firm to cease work); Rest. Law Third § 20—Lawyer's Duty to Inform and Consult with a Client.

Whether counsel to a debtor in possession has a fiduciary duty to the estate and creditors (as opposed to a duty to a client that has a fiduciary duty to the estate and creditors),[32] and the extent of such a duty, are developing concepts, in part because the articulation of an overly broad duty might impose an unwarranted strain on the attorney-client relationship and the attorney-client privilege.[33] The issue does not appear, moreover, to have been directly addressed in a transnational case under the Bankruptcy Code.[34] The Court therefore is somewhat reluctant to deal with the issue, which is only an alternative basis for denying the objections of the Joint Administrators and the Ad Hoc Committee.

Nevertheless, given the central importance of the automatic stay for the benefit of the estates, the Court's jurisdiction and good order, as discussed above, it is easy to conclude that CWT did have an independent obligation to start the Stay Litigation, whether based on a fiduciary duty that it had to Cenargo's estates and creditors in general or, alternatively, because by failing to do so CWT would have breached the requirement under section 327(a) of the Bankruptcy Code that it be "disinterested." (The Court also believes that a determination of CWT's duty under such circumstances would assist the English Court, as per its Letter of Request II.) Said differently, had CWT not acted in response to Lombard's stay violation, in deference to its new "clients"—the JPLs— CWT would have had its fees reduced under section 328(c) of the Bankruptcy Code ("the court may deny allowance of

**32.** There is no question that a debtor in possession is a fiduciary, like a chapter 11 trustee, for the estate, creditors and shareholders. *CFTC v. Weintraub*, 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *In re Bidermann Indus., U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr.S.D.N.Y.1997).

**33.** *See, e.g.,* C.R. Bowles, Jr. & Nancy B. Rapoport, *Has the DIP's Attorney Become the Ultimate Creditors' Lawyer in Bankruptcy Reorganization Cases?*, 5 Am. Bankr.Inst. L.Rev. 47, 59–68 (1997) (hereafter *"Bowles & Rapoport"*) (citing numerous cases holding that counsel to a debtor in possession has such an independent duty, including, in certain instances, to act contrary to the client's instructions even if the client is not about to commit a crime or a fraud, but noting that the parameters of such duty are unclear). *Contrast In re Sky Valley, Inc.*, 135 B.R. 925, 938–39 (Bankr. N.D.Ga.1992) ("The unique circumstances which surround insolvency and the filing of a Chapter 11 case place the attorney for the debtor in possession in the unusual position of sometimes owing a higher duty to the estate and the bankruptcy court than to his client.... The attorney for a debtor in possession is not merely a mouthpiece for his client.") *with Hansen, Jones & Leta, P.C. v.*

*Segal*, 220 B.R. 434, 467 (D.Utah 1998) (rejecting majority view that counsel has an independent duty to estate and creditors); *see also ICM Notes, Ltd. v. Andrews & Kurth, L.L.P*, 278 B.R. 117, 126 (S.D.Tex.2002), *aff'd* 324 F.3d 768 (5th Cir.2003) (while counsel may have a duty to estate and creditors in general, counsel does not have a fiduciary duty to particular creditors); *In re Sidco, Inc.*, 173 B.R. 194 (E.D.Cal.1994) (attorney's independent duty to estate exists only in unusual circumstances; basic tenet is that attorney has fiduciary duty only to client, the debtor in possession).

**34.** *But see In re Gee*, 53 B.R. at 891, in which a Cayman Islands liquidator moved for the dismissal of a subsequently-filed chapter 11 case because the debtor's management had been displaced by his appointment. *Id.* at 894. The Court did not rely on this argument, however, in dismissing the chapter 11 case under section 305(a) of the Bankruptcy Code; notwithstanding the contention that the debtor in possession had been displaced, the Court considered the arguments of the debtor in possession's counsel, although the Court eventually dismissed the chapter 11 case as duplicative of the Cayman Islands proceeding. *Id.* at 904–05.

compensation for services and reimbursement of expenses of a professional person . . . if . . . such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate . . .").[35]

The most analogous precedent for such a duty is a decision by the former Bankruptcy Appellate Panel for this Circuit. *In re JLM, Inc.,* 210 B.R. at 19. In *JLM,* control of the debtor in possession had passed to a creditor who had recently obtained the former shareholders' stock. The debtor in possession then instructed previously court-approved counsel, Zeisler & Zeisler, to move to dismiss the chapter 11 case. However, because dismissal would have enabled the newly installed shareholder—which was also a creditor of the debtor—to re-perfect a lapsed lien on the debtor's assets, Zeisler & Zeisler not only refused its client's instruction ("taking the position that the [shareholder/]creditor's actions were violative of the automatic stay . . . solely to 'torpedo' JLM's reorganization effort," *id.* at 21), but also objected, against the debtor in possession's wishes, when the shareholder/creditor later filed its own motion to dismiss the chapter 11 case.[36] Later, the shareholder/creditor objected to Zeisler & Zeisler's application for compensation under section 330(a) of the Bankruptcy Code, contending that Zeisler & Zeisler really had not been representing the debtor in possession, which had consistently supported the shareholder/creditor. *Id.* at 22. The Bankruptcy Court sustained the fee objection, *id.* at 22–23, but the Bankruptcy Appellate Panel reversed and remanded. *Id.* at 25–26.

The appellate panel noted that "In the nonbankruptcy context, absent ongoing fraud or criminal activity, an attorney's obligation is to advise the client and, if the client disagrees, resign." *Id.* at 26. But, the Court continued, counsel for a debtor in possession has a higher duty, requiring independent action if the debtor breaches its fiduciary duties to the estate:

> [B]ecause bankruptcy causes fundamental changes in the nature of corporate relationships, obligating the corporation's board of directors to consider the best interests of creditors, and because counsel for the debtor in possession has fiduciary obligations not ordinarily foisted upon the attorney-client relationship, the attorney for the debtor in possession may not simply resign where the client refuses the attorney's advice concerning the client's fiduciary obligations to the estate and its creditors. *Counsel must do more,* informing the court in some manner of derogation by the debtor in possession.

*Id.* (internal quotation and citations omitted, emphasis added). *See also Jackson v. Levy,* 2000 WL 124822, 2000 U.S. Dist. LEXIS 825 at 21 (S.D.N.Y. February 2, 2000) (accord); *In re Angelika Films,* 227 B.R. at 42 ("[T]he bankruptcy court may deny a professional's fees on account of serious breaches of fiduciary obligations. . . . To receive an award of attorneys fees under Bankruptcy Code § 330, it is not enough for an attorney to work ethically and zealously for a client whose interest may be antithetical to the estate's interest.") (internal quotation and citations omitted). Thus, in *JLM* the appellate pan-

---

35. *See Bowles & Rapoport,* 5 Am. Bankr.Inst. L.Rev. at 65 n. 142 (noting "We've been unable to find any reported case where Estate Counsel was sanctioned for wrongly disclosing DIP misconduct.").

36. The Court noted that the controlling shareholder never sought to terminate Zeisler & Zeisler's retention as counsel for the debtor in possession. *Id.* Similarly the JPLs, who, under English law, controlled Cenargo, never fired CWT or AMA.

el held that "Zeisler & Zeisler properly refused [the controlling shareholder's] instructions to move to dismiss JLM's case." 210 B.R. at 26. It remanded for the lower court to determine, however, whether Zeisler & Zeisler was acting for the estate's interests when it opposed the appointment of a chapter 11 trustee. *Id.*

The foregoing decisions also can be read based on the alternative, though related, requirement under sections 327(a) and 328(c) of the Bankruptcy Code that counsel for the debtor in possession be "disinterested" and not "represent or hold an interest adverse to the estate." *In re JLM*, 210 B.R. at 24; *Angelika Films*, 227 B.R. at 37–40; *see also In re Rancourt*, 207 B.R. 338, 358–59, 360–61 (Bankr. D.N.H.1997); *In re Kendavis Indus. Int'l, Inc.*, 91 B.R. 742, 751 (Bankr.N.D.Tex. 1988) (each holding that when a debtor in possession is clearly acting adversely to the estate, counsel is not disinterested if it supports its client). *Cf. In re Office Products of America, Inc.*, 136 B.R. 983, 988 (Bankr.W.D.Tex.1992) (given complex role of counsel to debtor in possession and the chilling effect of imposing such a duty broadly, client's conflict of interest must be clear before such duty arises).[37]

Here, CWT was not protecting management or the controlling shareholder at the expense of the estates and creditors. To the contrary, CWT sought to enforce the automatic stay to protect the Court's jurisdiction and to ensure that the estates would not suffer adverse consequences from Lombard's *ex parte* invocation of provisional liquidation. The potentially self-serving nature of Lombard's action, discussed above, highlighted the need to avoid tacitly endorsing Lombard's approach and disappearing from the scene. Significantly, CWT was supported throughout the Stay Litigation by the Official Committee and, while the Ad Hoc Committee somewhat hedged its bets, that group of creditors also acknowledged that it clearly benefitted from the Stay Litigation, which enabled it to negotiate the agreement with Lombard. Indeed, the only parties opposed to the Stay Litigation were the parties against whom it was directed, and even they quickly worked during the period that the status quo was preserved to reconcile the jurisdictional issues. Given the foregoing, therefore, as well as the central importance of the automatic stay under the Bankruptcy Code, even if it could be said that CWT had a new client after the start of the joint provisional liquidations, CWT was under an obligation under U.S. law to commence the Stay Litigation notwithstanding the JPLs' contrary wishes.

### III. *Should the Professionals' Fees and Expenses Be Reduced?*

■ A. *The Conduct of the Stay Litigation.* Consistent with the foregoing,

---

**37.** Although a debtor in possession is a fiduciary for its estate and creditors, *CFTC v. Weintraub*, 471 U.S. at 355–56, 105 S.Ct. 1986, it also is an operating entity with rights like any other party in interest. One of those rights is to retain its chosen professionals; the debtor in possession, not the "estate," has the power to retain a professional to assist it. 11 U.S.C. § 327(a). Relatedly, the attorney-client privilege for a debtor corporation belongs to the debtor in possession, not the estate (which is not a legal entity for this purpose). *CFTC v. Weintraub*, 471 U.S. at 355–56, 105 S.Ct. 1986. But, the privilege belongs to the debtor in possession only because it is a fiduciary, *id.* at 355–56, 105 S.Ct. 1986; *cf. In re Commercial Fin. Servs.*, 247 B.R. 828, 842–43 n. 16 (Bankr.N.D.Okla. 2000) (privilege belongs to trustee or debtor in possession, but it is property of the estate), and, in keeping with the court's supervision of a fiduciary for the estate, the debtor in possession cannot retain the professional of its choice without prior court approval, and that approval will not be granted and the professional's compensation will not be authorized unless the proposed professional is "disinterested." 11 U.S.C. §§ 327(a), 328(c).

CWT's conduct of the Stay Litigation was reasonable under the circumstances.[38] Like the other parties, CWT took a measured approach once the litigation began. Particularly given the novel issues raised by the conflicting orders of courts in competing jurisdictions, CWT used good judgment in charting a course between preserving the estate's rights under the automatic stay and not stirring up trouble, which led to the swift resolution of the matter, with the exception, ironically, of the pending dispute over professional fees.[39]

One can certainly employ the same logic to CWT and AMA that Mr. Rollings applied to the English Court's award of Lombard's fees in requesting the joint provisional liquidations and defending against the Stay Litigation: CWT and AMA were acting under the color of applicable law (in this case, the stay under section 362 of the Bankruptcy Code and the duties of estate-retained professionals) and should not be penalized for doing so.

It should be noted that in its conduct of the Stay Litigation CWT particularly deferred, again, to the Ad Hoc Committee, the group that Cenargo always believed had the most at stake in its restructuring.

The Court, therefore, finds it difficult to see the Ad Hoc Committee's objection as anything more than a *post hoc* attempt to try to rationalize the avoidance of fees that rightly should be paid ahead of the high yield noteholders' distributions. This is particularly the case given the Ad Hoc Committee's initial advocacy of the conditions under which the Suspension Order was issued: (1) that the parties would recommend this Court's determination of the professional fees to the English Court, for payment, and (2) that this Court should retain jurisdiction over the Stay Litigation at least until the Ad Hoc Committee was assured that Lombard continued to support the restructuring approach memorialized in the February 5, 2003 letter agreement. The Ad Hoc Committee's overly narrow reading of the $300,000 carve-out in the cash collateral order similarly appears to be an after-the-fact rationalization inconsistent with the carve-out's purpose, as discussed above,[40]

B. *Fees and Expenses Related to Cross–Border Issues.* The decision not to file originally for administration in England is more open to question, although the basis for any fee reduction related thereto must be carefully articulated in

**38.** The same can be said of AMA's services in connection with the Stay Litigation.

**39.** The objectants suggested that CWT should have moved in the English Court for reconsideration of its order commencing the joint provisional liquidations and the anti-suit injunction, rather than here. According to Mr. Rollings' testimony, such relief was available given the *ex parte* nature of Lombard's applications. However, there is extensive precedent for seeking an order enforcing the automatic stay in the bankruptcy court with jurisdiction over the case rather than from the court in which the alleged breach of the stay occurred. *See, e.g., In re Nakash,* 190 B.R. at 763; *In re Premier Sports Tours,* 283 B.R. 598 (Bankr.M.D.Fla. 2002); *United States Lines, Inc. v. GAC Ma-*

*rine Fuels Ltd. (In re McLean Indus., Inc.),* 76 B.R. 291 (Bankr.S.D.N.Y.1987). Given that these cases and the automatic stay under section 362 preceded the joint provisional liquidations and that CWT was facing an emergency with a significant time difference between New York and London, CWT cannot be faulted for choosing this Court as the forum for the Stay Litigation, although it also could have sought reconsideration in the English Court.

**40.** The Court also rejects the suggestion in the Ad Hoc Committee's objection that, rather than starting the Stay Litigation, CWT should have requested the appointment of a chapter 11 trustee. This merely would have increased the cost and delay triggered by the competing proceedings and injunctions.

light of the chilling effect that such reduction may have on the future exercise of professional judgment.[41]

■ i. *The Decision to File under Chapter 11.* No one has questioned that Cenargo was eligible for chapter 11 relief under section 109(a) of the Bankruptcy Code, because Cenargo had property in the United States: the joint bank accounts and the stock pledged to secure the high yield notes. 11 U.S.C. § 109(a); *see also In re Paper I Partners, L.P.,* 283 B.R. 661, 674 (Bankr.S.D.N.Y.2002); *In re McTague,* 198 B.R. 428, 431–32 (Bankr.W.D.N.Y. 1996); *In re Global Ocean,* 251 B.R. at 38–9 (section 109(a) requires only minimal property in the United States to commence a bankruptcy case). In addition to the *Global Ocean* case, moreover, there recently had been at least two other successful chapter 11 cases involving shipping companies that had few assets in the U.S. but whose restructuring, like Cenargo's, primarily focused on U.S. high yield noteholders.

The objections suggest, though, that Cenargo's filing in the United States nevertheless was improper or in bad faith because (1) the bank accounts appear to have been created to augment Cenargo's property in the U.S. for purposes of section 109(a), and (2) Cenargo's other assets and its creditors, with the exception of the high yield noteholders, were located outside the U.S. There is no evidence of any bad faith underlying Cenargo's filing for chapter 11 relief, however. Cenargo's chapter 11 filing did not have any improper purpose, such as to frustrate legitimate creditor rights or to favor one group of creditors or shareholders and management over other creditors. To the contrary, Cenargo filed in response to the demand by its largest creditors—the high yield noteholders—to file here, which was backed up by the credible threat of an involuntary chapter 11 if Cenargo did not do so. If such an involuntary case had been filed, Cenargo clearly would have been harmed. CWT and AMA correctly believed that the high yield noteholders would be the creditors most affected by a restructuring, and their threat was imminent. The noteholders and the other major secured creditors, moreover, had U.S. counsel, while professionals for the Official Committee, who would primarily represent the interests of foreign creditors, would be compensated by the debtors' estates under the Bankruptcy Code, thus protecting their interests.[42] Therefore, the chapter 11 cases would not be expected to unduly inconvenience the creditors. Finally, CWT and AMA also would have known that courts in this Circuit have experience in cross-border cases and would devote resources to try to harmonize these chapter 11 cases with proceedings that might arise abroad. Given those circumstances, in addition to CWT's concern that Lombard might thwart a restructuring by controlling the English administration of its special purpose obligor, the funding of the U.S. bank accounts in the fall of 2002 might even be viewed as prudent planning. *In re Global Ocean,* 251 B.R. at 38–9. In any event, as shown by Cenargo's eventual decision to seek administration in England

---

**41.** CWT argues that the decision not to file in England was Cenargo's, not the professionals', but this truism does not relieve the professionals of the consequences of their advice on an issue upon which Cenargo would have heavily relied on their expertise. There was no suggestion that Cenargo acted against CWT's advice.

**42.** The Official Committee consistently supported Cenargo and CWT's actions throughout the chapter 11 cases, except when the Committee objected to the suspension of the cases under section 305(a).

and CWT's decision not to oppose the Suspension Order, the establishment of the bank accounts and the chapter 11 filings were not undertaken to remove assets from creditors, and CWT was acting responsively to the creditors' interests. Consequently, CWT and AMA should not be penalized for advising Cenargo to file under chapter 11.

    ■■■ ii. *The Decision to File Only under Chapter 11.* Nevertheless, negative consequences followed Cenargo's decision to file only in the U.S. and not to be prepared at least to make a rapid protective filing in England. Two possible costs arose from this decision: the cost of paying foreign creditors under the "necessity of payment" first-day order, and the cost of responding to Lombard's initiation of the joint provisional liquidations (as well as extra time spent dealing with other creditors who threatened not to observe the automatic stay).

The first cost is capped at approximately $225,000, the amount of *force majeure* payments that Mr. Rollings testified the Joint Administrators dispute. However, it is likely that such cost really is far lower and perhaps is immaterial. First, it should be reduced by the percentage distribution that similar creditors would reasonably be projected to receive under a scheme of arrangement, which may be substantially all of the amount in question. Second, the Joint Administrators did not establish the disputed amount with specificity and did not successfully refute CWT's assertion that all or a substantial portion of the payments were made in the reasonable exercise of Cenargo's business judgment as beneficial to the estates and creditors generally. Finally, any true, net cost to the estates from such payments would appear to be offset by the savings of not running English administration proceedings and chapter 11 cases at the same time

between January 14 and January 28, 2003. Based on Mr. Rollings' testimony regarding the cost of the English proceedings since the appointment of the JPLs, that savings is considerable.

The litigation cost attributable to the decision to file only under chapter 11 also is difficult to quantify. In addition to the cost of English proceedings between January 14 and January 28, 2003, Cenargo's estates clearly would have incurred material expense to harmonize U.S. and English proceedings if Cenargo had originally chosen to file tandem cases. A substantial portion of the cost that CWT listed in its fee application in the "stay litigation" and "discussion with creditors" categories would have been incurred, therefore, in any event, because most of the Stay Litigation really was focused on resolving the dueling jurisdictional issues (a process, again, that the Ad Hoc Committee stated benefitted the high yield noteholders and furthered Cenargo's restructuring by leading to an agreement that protected the English Channel time charters). For example, it is likely that Lombard would have raised issues pertaining to its lease facility even if Cenargo had started an English administration on or shortly after January 14, particularly because Cenargo probably would have relied for some period on the existence of the U.S. cases in order to prevent Lombard from trying to derail the overall restructuring process.

On the other hand, by not originally filing English administration proceedings, or being ready at a moment's notice to do so, Cenargo left itself open to the risk of considerable disruption if creditors who effectively were not bound by the automatic stay either arrested vessels or initiated liquidation proceedings. Either of those events would have harmed the estates, at a minimum by creating additional confusion before some orderly process for dealing

with the restructuring of the business as a whole could be reconstituted. Fortunately, that minimum disruption appears to be all that the estates have suffered here. The very real prospect of such harm—and the potentially far greater harm that could have occurred—reasonably should have outweighed the countervailing considerations that CWT apparently considered when it originally advised not to file in England: economy and the possibility that Lombard would derail administration proceedings. This is particularly the case because Cenargo had no express assurance the Lombard would not initiate involuntary proceedings. The fees charged by CWT attributable to that additional confusion and disruption that CWT should reasonably have foreseen the Court finds to be $140,000.

Should CWT bear the whole cost of such disruption? The Court believes that a portion of the cost to the estates should be shared by Lombard, which, by acting *ex parte,* needlessly contributed to the confusion in a way that, given the sophistication and participation in the U.S. of Lombard's counsel, CWT could not have entirely anticipated. However, the cost of the risk taken by Cenargo is not limited to CWT's fees attributable to responding to Lombard's action. The creditors directly incurred costs as well, paying their own professionals, and the estates bore the cost of the Official Committee's counsel in dealing with the Stay Litigation. Therefore, CWT is bearing a fair amount of the cost attributable to its advice not to file originally in England by having its fees reduced by $140,000, particularly since this deduction also takes into account the disputed *force majeure* payments and any

concerns of the Court about CWT's request for fees incurred defending its application for compensation.

■ In addition, CWT's requested fees should be reduced by $11,000, the amount attributable to CWT's drafting a chapter 11 plan starting on February 6, 2003. With the initiation of the English administration already having occurred and the suspension of these cases under active discussion at the time, it clearly was premature for CWT to have performed this work, which, unlike all of CWT's other services in these cases, seems to have been motivated less by what was best for the estates and creditors than by the desire to make a litigation point related to the Ad Hoc Committee's motion under section 305.

iii. *AMA's Fees and Expenses.* There was little or no evidence of AMA's involvement in the decision not to file originally in England. A review of AMA's time records also indicates that, while the Joint Administrators have chosen not to use AMA's work, AMA performed reasonable services under the circumstances. In addition to its work in connection with the Stay Litigation, AMA was involved in ensuring the debtor's ability to use cash collateral and other tasks ordinarily performed by a restructuring advisor in the early stages of a chapter 11 case. Moreover, AMA's imputed rate for such services was under $65 per hour, which is so low as to chill the heart of an investment banker. The Court therefore approves AMA's requested fees.[43]

■ However, because it staffed the case with U.S.-based personnel that it then

**43.** The Joint Administrators' contention that AMA agreed not to seek fees after December 20, 2002 verges on the frivolous, given that in January 2003 Cenargo filed an application in the Court to retain AMA and the fact that the basis for the Administrators' assertion is an obvious error in AMA's retention letter (as shown by section 3 of that letter, which provides for AMA's retention through at least December 20, *2003* ).

stationed in England, AMA incurred unusually high hotel, transportation and meal charges. Under the circumstances of these cases, AMA should bear a substantial portion of such expenses, which accordingly will be reduced by $26,458.

■ iv. *The Barristers' Fees and Expenses.* The Court has not undertaken to review the bills of the barristers brought in by CWT to assist in starting the English administration proceedings. This not only is because such professionals cannot be compensated under sections 330 or 503(b) of the Bankruptcy Code unless their retention has been approved by the Court under section 327 of the Code, *see, e.g.,* Bankruptcy Rule 2014(a); *In re Keren Ltd. P'ship,* 189 F.3d 86, 88 (2d Cir.1999), but also because the Joint Administrators have assured the Court that the barristers may apply in England to be compensated for such work, which application the Joint Administrators will support. The English Court, therefore, is in the best position to review these fees. CWT's requested expenses accordingly will be reduced by the amount sought on behalf of the barristers, $62,362.25.

### A Note on Comity

The suspension of these cases was conditioned on only the agreement of the Joint Administrators and the Ad Hoc Committee that they would recommend to the English Court that the professional fees and expenses approved by this Court be paid as expenses of the Cenargo debtors' administration in England. It so happens that, as discussed above, the Joint Administrators and the Ad Hoc Committee have reversed their positions on this point. But, in any event, the English Court, like this Court, independently reviews professional fees and expenses and would not be bound by the recommendations of the Joint Administrators or the creditors with the most at

stake, the Ad Hoc Committee, even if they made such recommendations. Nor would the English Court be bound by this Court's ruling, unless it decided to follow it after applying principles of international comity. Moreover, there are no material assets of the Cenargo debtors remaining in the United States or under the Court's practical control; thus, CWT and AMA cannot be assured that they will receive the fees and expenses herein allowed.

This opinion, therefore, is written with an eye to assisting the English Court's consideration of whether the fees and expenses of CWT and AMA should be paid in the English proceedings on a priority basis ahead of the unsecured creditors and the high yield noteholders.

In its Letter of Request I the English Court suggested that it would give favorable consideration to imposing no penalty for the potential violation of its January 28, 2003 injunction if this Court similarly did not punish the JPLs and Lombard. This Court agrees with the English Court that, given the parties' joint efforts to protect the estates after January 28, the imposition of such penalties would be counterproductive. Before the professional fee hearing, I again adjourned the hearing on the Stay Litigation, *sua sponte.* I have recently been informed at a status conference in these chapter 11 cases that the Joint Administrators, Lombard and the Ad Hoc Committee have continued to work on a consensual scheme of arrangement in the English proceedings and that the Lombard standstill agreement has been extended. The Ad Hoc Committee, therefore, no longer desires to keep the Stay Litigation on the Court's docket.

Given the primary focus of the two Courts and the professionals on preserving value for the creditors, it does not seem worthwhile for the parties to incur additional costs in connection with sanction

litigation or to be penalized for pursuing such litigation at this time (including by fee reductions beyond those set forth herein), particularly as it appears that the estate-compensated professionals were simply doing their jobs under difficult and novel circumstances and were not trying to gouge the estates or to pursue some other nefarious purpose. This is consistent with the special role of comity in transnational bankruptcy proceedings to "enable the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion" (provided that this does not violate the laws and public policy of the forum state or materially frustrate the legitimate expectations of its residents). *Cunard S.S. Co. Ltd. v. Salen Reefer Services AB*, 773 F.2d 452, 457–58 (2d Cir. 1985); *see also Maxwell Commun. Corp. v. Societe Generale*, 93 F.3d at 1048 ("The analysis must consider the international system as a whole in addition to the interests of the individual states, because the effective functioning of that system is to the advantage of all the affected jurisdictions."). Therefore, the Stay Litigation shall be dismissed with prejudice, and the Court reiterates its request made in the Suspension Order that the English Court grant comity to this decision.

It is SO ORDERED.